IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–02261–EWN

PHILLIP A. NOVAK,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is a social security benefits appeal.  Plaintiff Phillip A. Novak challenges the final

decision of the Commissioner of Social Security (the "Commissioner") denying his application for

Social Security Disability Insurance benefits.  Jurisdiction is premised upon 42 U.S.C. § 405(g)

(2006).

## FACTS

### 1.    *Medical Evidence*

Plaintiff was born on June 30, 1955 and was forty-six years old at the onset of his alleged

disability.  (Admin. R. at 51, 75 [filed Jan. 27, 2006] [hereinafter "Admin. R."].)  Plaintiff has a

high school education and worked in the vocationally relevant past as a restaurant worker,

machine operator, groundsman, press operator, group home counselor, and driller.  (*Id*. at 76,

81.)  Plaintiff alleges that he became unable to work beginning on November 30, 2001 due to

degenerative disc disease resulting in the narrowing of his spinal canal as well as shoulder and

joint injuries.  (*Id.* at 75.)

      *a.*      ***Pre-Onset Medical History***

      On June 20, 1989, Plaintiff presented at St. Agnes Hospital in California with a work-

related injury incurred when he fell into a hole and landed on a piece of machinery.  (*Id.* at 159.)

Plaintiff was treated for constant pain in his lower back and pain radiating down his right leg.

(*Id.*)  On May 2, 1990, Durell D. Sharbaugh, M.D. evaluated Plaintiff for the California State

Compensation Insurance Fund ("CSCIF").  (*Id.* at 165.)  Dr. Sharbaugh noted that Plaintiff's

symptoms had gone unchanged for six months and opined Plaintiff to be "permanently disabled

with regards to heavy work."  (*Id.* at 168.)

      On January 20, 1994, Ahsan K. Bajwa, M.D. noted in a letter to CSCIF that Plaintiff's

back pain persisted unchanged, but Plaintiff was taking his pain medication less frequently and had

begun to run his own print shop.  (*Id.* at 183.)

      On February 25, 2000, Plaintiff returned to Dr. Bajwa, complaining of lower back pain

radiating into the right leg, which Dr. Bajwa attributed to a herniated disc.  (*Id.* at 181.)  In

another letter to CSCIF, Dr. Bajwa noted muscle spasms, tenderness, limited range of motion,

and a positive straight leg raise on the right side.  (*Id.*)

      On May 21, 2001, Plaintiff was treated for chemical burns on his knees, sustained while

putting cement in at his home.  (*Id.* at 265.)  Plaintiff also reported having spent three months in a

burn ward "years ago," after having been "caught in an explosion," sustaining injuries requiring

reconstructive surgery for his ears and a skin graft on his thorax.  (*Id.*)  Plaintiff reported back

pain, but indicated he took no medications on a daily basis.  (*Id.*)

### b.     *Post-Onset Medical History*

On December 2, 2001, Plaintiff presented to William Brinton, M.D. of the San Luis Valley

(Colorado) Regional Occupational Medicine Program, complaining of a work-related injury.  (*Id.*

at 370.)  Plaintiff reported significant pain in his right lower back radiating down his right leg,

along with right shoulder pain.  (*Id.*)  Plaintiff indicated the pain began after he reorganized boxes

in a walk-in freezer at work for about two hours on November 30 and subsequently became so

severe that he was unable to work the following day.  (*Id.*)  Dr. Brinton diagnosed lumbar strain,

preexisting lumbar disc disease, right lumbar spinal cord disease, right shoulder strain, and anxiety

and nausea, possibly related to the back pain.  (*Id.*)  Dr. Brinton prescribed Vicodin and indicated

he would inform Plaintiff's employer, a fast food restaurant, that Plaintiff needed time off from

work.[1]  (*Id.* at 371.)

On December 6, 2001, Plaintiff returned to Dr. Brinton, reporting: (1) increased range of

motion in his right shoulder; (2) modest improvement in back pain; (3) little change in the pain

radiating down his right leg; (4) a bruised sensation on the right heel; (5) inability to lift; and (6)

difficulty standing or sitting for more than a few minutes.  (*Id.* at 366.)  Dr. Brinton prescribed

Ativan for Plaintiff's nausea and opined that Plaintiff would be unable to work for a week.  (*Id.*)

---

[1]Vicodin is a pain reliever.  J.E. SCHMIDT, M.D., 6–V ATTORNEYS' DICTIONARY OF
MEDICINE 1928 (Matthew Bender & Co. 2005) (hereinafter "ADM").

Dr. Brinton's follow-up records from December 20, 2001 indicate Plaintiff returned to work at some point since his previous visit, but he had only been working four-hour shifts at "light duty." (*Id.* at 361.)  Dr. Brinton noted that Ativan "may be helping with muscle spasm and definitely helps the severe anxieties [Plaintiff] has had since his reinjury." (*Id.*)  Plaintiff complained of dull pain in the right buttocks as well as continuing back and shoulder pain. (*Id.*)  Dr. Brinton: (1) recommended continued light duty work of no more than four hours per day; and (2) prescribed physical therapy, a trial of Lodine, and continued use of Ativan and Reglan.[2] (*Id.*)  Records indicate Plaintiff regularly attended physical therapy from December 2001 through early February 2002, and again in May through June of 2002. (*Id.* at 197–206.)

Plaintiff returned to Dr. Brinton on December 27, 2001. (*Id.* at 358.)  Plaintiff reported taking five Vicodin per day, two Lodine per day, and two Ativan per day. (*Id.*)  The doctor observed: (1) Plaintiff's lower back pain with intermittent radiculopathy symptoms had persisted for four weeks; (2) he suspected Plaintiff was exaggerating his back pain; and (3) Plaintiff's right shoulder strain was "objectively improving but subjectively worse."[3] (*Id.*)

On January 3, 2002, Plaintiff reported to Dr. Brinton that his back pain had not improved and noted new pain in his left buttocks, continued pain in his right heel, a new "throbbing pain in

---

[2]Lodine is a pain reliever.  3–L ADM 3614, *supra* note 1.  Reglan is used for treatment of nausea and vomiting.  5–R ADM 1520.

[3]Radiculopathy is "[a]ny disease or abnormality of a dorsal or ventral (sensory or motor) spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the point where it joins its companion root (a motor or a sensory) to form a spinal nerve."  5–R ADM 218, *supra* note 1.

the left ankle and foot," and improvement in his shoulder after taking two days off from work. (*Id.* at 355.)  Plaintiff reported taking three to four Vicodin per day, one Ativan per day, and ceased use of Lodine.  (*Id.*)  Plaintiff reported he "tolerates more than three hours work poorly and has left early most days."  (*Id.*)  Review of a spinal x-ray showed no bony lesions except for a bone spur at L4 and facet arthritis at L5-S1.  (*Id.*)  Dr. Brinton observed Plaintiff's: (1) right lower back pain was unimproved, with no radiculopathy present on exam; (2) bilateral heel and ankle pain appeared to be consistent with "arthritis/bone spur problems;" and (3) right shoulder pain was improving with physical therapy.  (*Id.*)  Dr. Brinton recommended Plaintiff continue with his light-duty, four-hour shifts.  (*Id.* at 356.)

On January 28, 2002, Dr. Brinton made the following findings: (1) Plaintiff could not relax legs; (2) positive supine straight leg raise at thirty to forty-five degrees on the right and at thirty degrees on the left; (3) sitting straight leg raise was "negative on the left and on the right at [ninety] degrees;" (4) somewhat stiff gait; (5) "right shoulder flexion and abuduction limited to [ninety] degrees;" and (6) "rather superficial tenderness of the bilateral paralumbar and midline lumbar areas."  (*Id.* at 353.)  Treatment notes reveal that Dr. Brinton notified Plaintiff's employer that Plaintiff was to be off work for one week.  (*Id.*)

On February 5, 2002, Dr. Brinton's review of an MRI revealed "bulging discs on all levels, worse at L3-4 and L5-S1. . . ."  (*Id.* at 351.)  Dr. Brinton referred Plaintiff to David A. Wong, M.D. for an evaluation and treatment plan.  (*Id.*)  Dr. Wong diagnosed "multifactorial pain, lumbar sprain/strain . . . , preexisting chronic multilevel degenerative changes . . . , L5-S1 and possibly L4-5 facet arthritis as a pain generator and right lower extremity numbness in a

nonanatomic distribution." (*Id.* at 293–94, 348.)  Dr. Wong did not think surgery would reduce

Plaintiff's pain.  (*Id.* at 294.)  Thereafter, Dr. Brinton referred Plaintiff to Steve Ford, M.D. for

bilateral L5-S1 facet injections.  (*Id.* at 349.)

After visits on February 22 and 25, Plaintiff returned again to Dr. Brinton on March 18,

2002.  (*Id.* at 348–44.)  Plaintiff noted: (1) improvement in lower back pain after Dr. Ford

administered bilateral facet injections; (2) back pain persisted with work; and (3) the injections

had not improved the numbness in his right leg.  (*Id.* at 344; *see also id.* at 230, 238.)  Constant

pain persisted "in the back of both legs traveling to the outside of both feet."  (*Id.*)  Plaintiff

reported his right shoulder to be "[one hundred] percent better."  (*Id.*)  Plaintiff returned to Dr.

Ford for injections on March 22, April 5, May 3, and July 5, 2002.  (*Id.* at 208–231, 193.)  The

treatments yielded decreasing benefits.  (*Id.*)

On April 9, 2002, Plaintiff visited Patrick E. Sternberg, M.D. for a neurology evaluation.

(*Id.* at 186.)  Dr. Sternberg conducted an electromyography ("EMG").[4]  (*Id.* at 188.)  Dr.

Sternberg attributed Plaintiff's lower back pain to "a chronic musculotendinous condition with an

acute musculotendinous exacerbation superimposed."[5]  (*Id.* at 189.)  Dr. Sternberg also diagnosed

a "mild neuropathy" and could not rule out myopathy.[6]  (*Id.*)

---

[4]Electromyography is "the production and interpretation of tracings (i.e., visual recordings) of the electrical changes in active muscles."  2–E ADM 1109, *supra* note 1.

[5]Musculotendinous disorders are, unsurprisingly, those involving muscles and tendons. *See* 4–M ADM 6618, *supra* note 1.

[6]Neuropathy is "[a] nervous disease affecting the nervous system, especially a degenerative rather than inflammatory disease of a cranial or spinal nerve."  4–N ADM 1992,

On April 11, 2002, Plaintiff returned to Dr. Brinton, complaining that the EMG caused "significant pain in his lower extremity that has persisted." (*Id.* at 342.) Plaintiff had not worked since his visit to Dr. Sternberg because of the pain. (*Id.*) Dr. Brinton recommended that Plaintiff remain off work for two more days. (*Id.*)

Records from regular visits to Dr. Brinton's office reveal that Plaintiff continued to suffer back pain and pain in his legs, heels, and buttocks through June 2002, which caused him to miss weeks of work. (*Id.* at 340–319.) Lab notes from May 17, 2002 indicate Plaintiff tested negative for lyme disease. (*Id.* at 381.)

A June 2002 radiology report by Robert L. McHugh, M.D. revealed: (1) disc narrowing at L3-4 and L5-1; (2) prominent posterior bone spur impinging into the spinal canal at L5-S1; and (3) facet joint arthritic changes at L4-5 bilaterally. (*Id.* at 263.) These findings were unchanged from a previous examination in December 2001. (*Id.*)

On July 9, 2002, Plaintiff visited an emergency room because of worsening deep pain in the right groin, caused by "a manipulation in physical therapy" on June 12, 2002. (*Id.* at 322.) The next day, Plaintiff followed up with Dr. Brinton, who prescribed a long-acting opioid. (*Id.* at 323.) Plaintiff mentioned he "feels depressed, has been crying frequently for the past [two to three] weeks though he is not sure why." (*Id.* at 322.) A July 19, 2002 radiology report concerning Plaintiff's "right buttocks pain" revealed no abnormalities. (*Id.* at 252.)

---

*supra* note 1. Myopathy is muscular disease. 4–M ADM 7252.

On July 26, 2002, Plaintiff returned to Dr. Brinton, who noted Plaintiff's medications were: (1) Neurontin (for tremors); (2) Vicodin (for pain), six per day; (3) Elavil (for depression); (4) Dalmane (for insomnia); and (5) Reglan (for nausea).  (*Id.* at 319.)  Plaintiff reported: (1) he returned to the emergency room on July 19 because of worsening back pain; (2) he continued to work four hours per day, three days a week, non-consecutively; and (3) he was "crying somewhat less." (*Id.*)

On August 14, 2002, Dr. Brinton wrote a "Maximal Medical Improvement" ("MMI") report.[7]  (*Id.* at 308–13.)  Dr. Brinton assessed: (1) multi-level degenerative disc disease; (2) lumbar degenerative joint disease with prominent facet hypertrophy, which was likely aggravated on November 30, 2001; (3) right sacroiliitis; (4) right shoulder strain; (5) probable bilateral lower extremity peripheral neuropathy; and (6) opioid and benzodiazepine dependence.[8]  (*Id.* at 311.) Dr. Brinton revised Plaintiff's "recommended permanent work limitations to be sedentary work only with very limited bending and very limited standing and walking." (*Id.* at 312.)

September 5, 2002 follow-up notes from Dr. Wong indicate no changes since Plaintiff's February visit.  (*Id.* at 291.)  In September 17, 2002 follow-up treatment records, Dr. Brinton

---

[7]MMI is worker's compensation parlance signifying the point where one's condition "is well stabilized, and unlikely to change substantially in the next year with or without medical treatment."  *Norman v. Barnhart*, 2006 U.S. Dist. LEXIS 2705, at *9 n.3 (D. Cal. Jan. 25, 2006).

[8]Hypertrophy is "an abnormal enlargement of a part or an organ due to an increase in the size of its constituent cells."  3–H ADM 5541, *supra* note 1.  Sacroiliitis is the inflamation of the sacroiliac joint, which is the juncture of the sacrum (the lower part of the spine) and the ilium (the upper part of the hip bone).  5–S ADM 185.

opined Plaintiff reached MMI on August 14, 2002 and referred Plaintiff to a pain clinic to help

him cope with his pain level.  (*Id.* at 305.)

Plaintiff visited Raphael C. Francisco, M.D. on November 11, 2002.  (*Id.* at 567–68.)

Plaintiff reported he had lost his job.  (*Id.* at 568.)  Plaintiff reported he had developed "blood

blisters" on each heel on the night of October 18, and that after "popping" them, the skin on his

heels became numb.  (*Id.*)  Although Dr. Francisco could not determine the etiology of the

blisters, he advised Plaintiff that they were not serious.  (*Id.*)

Notes from a November 11, 2002 consultation with clinical psychologist Dale P. Mann,

Ph.D at the Colorado Sports and Spine Centers indicate Dr. Mann considered Plaintiff a "good

candidate for the three-week chronic pain rehabilitation program."  (*Id.* at 539–42.)  Plaintiff

began the program on December 2 and completed it on December 19.  (*Id.* at 543–56.)  At his

final counseling session, social worker Amy Alsum noted Plaintiff had learned much about "not

aggravating or elevating his pain."  (*Id.* at 557.)  Plaintiff stated he had also learned to "cope with

his depression" and expressed a desire to enter into vocational rehabilitation.  (*Id.*)

On December 27, 2002, Plaintiff returned to Dr. Brinton for a routine examination.  (*Id.* at

502.)  Plaintiff reported that he tolerated sitting well, but standing for more than a few minutes

caused increased back pain.  (*Id.*)  Dr. Brinton urged Plaintiff not to use Vicodin daily.  (*Id.*)  Dr.

Brinton noted Plaintiff's continued use of OxyContin, Vicodin, Reglan, amitriptyline, Dalmane,

and Neurontin.[9]  (*Id.*)  It is not clear when Plaintiff began taking OxyContin.

---

[9]OxyContin is a narcotic substance used for pain relief.  4–O ADM 3228, *supra* note 1.
Amitrptyline can be used to treat depression, sleep problems, and pain.  (Admin. R. at 427.)

A follow-up report from the Colorado Sports and Spine Centers on January 9, 2003 indicates Plaintiff: (1) rated his pain as a five out of ten; and (2) felt his mood had improved since completing the program.  (*Id.* at 559.)  Ms. Alsum opined that Plaintiff did not require any psychological follow-up.  (*Id.*)

On January 24, 2003, Dr. Brinton noted that Plaintiff's chronic back pain was at MMI with no further options available other than those previously discussed with Plaintiff.  (*Id.* at 500.) Dr. Brinton congratulated Plaintiff on his recent involvement in a job retraining program and continued Plaintiff's medications for "at least" two more months.  (*Id.* at 501.)  Dr. Brinton's follow-up records from March, April, and May 2003 reveal little change in Plaintiff's condition other than constipation attributed to Plaintiff's medications and increased complaints of "deep groin pain."  (*Id.* at 496–99.)

On May 20, 2003, Plaintiff saw Kenneth P. Finn, M.D. "to address issues of MMI and impairment rating" for the Colorado Division of Worker's Compensation.  (*Id.* at 560–63.)  Dr. Finn noted Plaintiff's symptoms to include: (1) right lower back pain radiating to the coccyx into the right hip and buttock, with associated right testicular pain and groin pain; and (2) burning pain in both legs along with the back of both calves and ankles into the heels, where Plaintiff felt a sharp pain on the right and a dull pain on the left.  (*Id.* at 561.)  Dr. Finn diagnosed: (1) right L4 through S1 joint dysfunction; (2) history of bilateral L4 through S1 radiofrequency neurotomy; (3) spinal canal narrowing L5-S1 secondary to degenerative disc disease; (4) "questionable history of right adductor strain;" and (5) "questionable right S1 joint dysfunction."  (*Id.* at 562.)  Dr. Finn opined that Plaintiff was not at MMI and recommended a treatment plan including "repeat medial

branch block of the right L4 through S1 facet joints," and, if that failed, "a one-time epidural steroid injection." (*Id.*)  Dr. Finn was skeptical of Plaintiff's groin pain, but discouraged additional physical therapy.  (*Id.* at 562.)  Dr. Finn opined Plaintiff had an eleven percent "whole person impairment" per the revised third edition of the AMA's *Guides to Evaluation of Permanent Impairment*.[10]  (*Id.* at 563.)

Various doctors at the San Luis Valley Regional Medical Center saw Plaintiff from June to October 2003.  (*Id.* at 494–88.)  On June 16, Plaintiff saw Donna Nelson, M.D. concerning his back pain and emergent bilateral edema in his feet, which medication helped reduce.[11]  (*Id.* at 494.)  Dr. Nelson attributed the edema to the increased amount of time Plaintiff spent sitting since starting retraining and occupational rehabilitation.  (*Id.*)  Another doctor switched Plaintiff to a second edema medication when the first became ineffective.  (*Id.* at 493.)  Subsequent notes reflect the second medication was effective.  (*Id.* at 490.)  Plaintiff sought a medical note to his retraining program authorizing him to take a half course load due to "difficulties."  (*Id.* at 492.)

On August 18, 2003, Plaintiff visited a Veteran's Administration ("VA") facility and saw Marco A. Celada, M.D. for the first time.  (*Id.* at 443.)  Dr. Celada opined that Plaintiff had chronic back pain, neuropathic pain, and pelvic pain.  (*Id.*)  The doctor further noted Plaintiff was

---

[10]"Impairment percentages estimate the extent of impairment on a whole person functioning and account for basis activities of daily living, not including work.  The complexity of work activities requires individual analysis.  Impairment assessment is a necessary first step for determining disability."  AM. MED. ASSOC., GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 13 (5th ed. 2001).

[11]Edema is a " swollen or puffed up condition of tissues due to excessive accumulation of fluids in the tissue spaces."  2–E ADM 556, *supra* note 1.

getting his medications from another clinic, but needed a prescription for Neurontin.  (*Id.*)  Dr. Celada referred Plaintiff to radiology for a pelvic MRI and to a pain clinic.  (*Id.*)

On August 29, 2003, Plaintiff saw Joseph Quintana, M.D. at the San Luis Valley Regional Medical Center.  (*Id.* at 490–91.)  Dr. Quintana noted the evaluation in June by Dr. Finn who found Plaintiff was not at MMI.  (*Id.* at 490.)  Dr. Quintana: (1) diagnosed chronic lower back pain and edema; (2) refilled Plaintiff's OxyContin, Vicodin, and Bumex (for edema); and (3) authorized continued use of Neurontin, Dalmane, and amitriptyline.  (*Id.*)

Treatment notes from a visit to a VA facility from August 21, 2003 indicate Plaintiff saw Donna M. Finicle, a licensed social worker, for treatment of depression, which a previous health screen had revealed.  (*Id.* at 438.)  Plaintiff reported suffering depression since his November 2001 reinjury.  (*Id.*)  Plaintiff extensively discussed his chronic pain, which he recognized as the cause of his depression.  (*Id.* at 439.)  Plaintiff asserted he did not want any further medication. (*Id.*)  It appears that Plaintiff declined further treatment for depression.  (*See id.*)

On September 25, 2003, Plaintiff returned to Dr. Quintana, who noted Plaintiff had been referred to John H. Bissell, M.D. for pain management treatments.  (*Id.* at 489.)  Plaintiff noted Vicodin was not very helpful for his "breakthrough" pain, so Dr. Quintana prescribed further painkillers.  (*Id.*)

On October 22, 2003, Plaintiff returned to Dr. Celada because he had run out of Neurontin.  (*Id.* at 442.)  Dr. Celada noted Plaintiff had a generalized tremor at rest.  (*Id.*) Plaintiff's visit to Dr. Quintana on October 23, 2003 revealed little change.  (*Id.* at 488.)  Dr.

Quintana refilled Plaintiff's medications and asked that he return in two months.  (*Id.*)  A November 24, 2003 VA depression screening was negative.  (*Id.* at 448.)

Radiologist Michael J. Brantley, M.D. reviewed a December 3, 2003 MRI, finding it confirmed that Plaintiff had degenerative disc disease in the lower back with protrusions at L4-5 and L5-S1 of "questionable clinical significance."  (*Id.* at 417.)  On December 22, 2003, Plaintiff saw Dr. Celada and discussed his pain at length.  (*Id.* at 441–42.)  The doctor suggested physical therapy, which Plaintiff dismissed as unhelpful.  (*Id.*)

On December 29, 2003, Plaintiff returned to Dr. Quintana, who gave Plaintiff refills and noted that the treatments suggested by Dr. Finn still had not been implemented, apparently because of Worker's Compensation delays.  (*Id.* at 487.)  No changes were noted, and Dr. Quintana recommended that Plaintiff return in three months.  (*Id.*)

On February 17, 2004, Plaintiff returned to Dr. Quintana for medication refills and for a referral to Dr. Bissell for implementation of the treatment program suggested by Dr. Finn.  (*Id.* at 486.)  Plaintiff requested the referral because "his attorneys had gotten the insurance to approve" the treatment.  (*Id.*)

On February 23, 2004, Plaintiff saw Nicole R. Gonzales, M.D. at the VA facility, apparently concerning his tremors.  (*Id.* at 444.)  Dr. Gonzales appears to have attributed Plaintiff's tremor to Plaintiff's "limitation by pain," but suggested a visit to a neurological clinic and noted that medication for anxiety would likely cure it.  (*Id.* at 446.)  Dr. Gonzales noted Plaintiff has a plate in his head.  (*Id.* at 445.)

On February 26, 2004, Plaintiff saw Dr. Bissell.  (*Id.* at 503–04.)  Dr. Bissell assessed: (1) degenerative disc disease; (2) low back pain; (3) lumbar disc displacement without spinal chord disease; and (4) bilateral ischial tuberosities, right worse than left.[12]  (*Id.* at 504.)  Dr. Bissell planned to administer: (1) radiofrequency treatment for Plaintiff's right lower back; and (2) a right ischial tuberosity injection, and, if that failed, an epidural steroid injection.  (*Id.*)

On March 16, April 19, and May 18, 2004, Plaintiff returned to Dr. Quintana for medication refills.  (*Id.*)  May 14, 2004 VA treatment records from Dr. Celada reflect Plaintiff's report that an epidural injection administered by Dr. Bissell on May 11 "did not help."  (*Id.* at 439, 531.)  On May 25, 2004, Plaintiff returned to Dr. Quintana and reported that the May 11 injection "helped quite a bit."  (*Id.* at 482.)  On April 1, 2004, Plaintiff returned to Dr. Celada after having visited an ER two days earlier for treatment for fever, vomiting, and dehydration. (*Id.* at 440.)  Plaintiff complained that Primidone given to him by a neurologist was giving him insomnia.  (*Id.*)  Dr. Celada prescribed lorazepam to treat anxiety and insomnia.  (*Id.*)

On July 1, 2004, Dr. Bissell administered an epidural steroid injection in Plaintiff's lower back.  (*Id.* at 528.)  Follow-up notes from July 15, 2004 indicate Plaintiff reported little relief from the injection.  (*Id.* at 527.)  Dr. Bissell opined Plaintiff had reached MMI and noted that a maximum of four injections per year would help Plaintiff maintain his current pain levels.  (*Id.*)

On August 24, 2004, Plaintiff returned to Dr. Quintana for a follow-up.  (*Id.* at 481.) Plaintiff noted that a recent epidural injection "resulted in only about [thirty] hours of

---

[12]Bursitis of ischial tuberosity is the inflammation of the lower part of the hip bone usually caused by prolonged sitting.  1–B ADM 5122, *supra* note 1; 3–I ADM 4420.

improvement in symptoms." (*Id.*) Plaintiff further reported "he [was] doing well on his current medication regimen and has plenty of medications at present." (*Id.*)

On a September 24, 2004 follow-up, Dr. Quintana noted Plaintiff reported "no change in his condition and, in fact, he is feeling slightly worse pain." (*Id.* at 479.) Plaintiff reported he had quit school because of inability to concentrate and had applied for Social Security Disability Insurance. (*Id.*) Dr. Quintana noted there had been no significant change in Plaintiff's conditions since August 2002. (*Id.*)

In a letter addressed "To Whom It May Concern" dated October 1, 2004, Dr. Quintana opined that Plaintiff suffers from: (1) multi-level degenerative disc disease in the lumbar spine including two disc herniations at L4-5 and L5-S1; (2) right sacroiliitis; (3) longstanding opioid pain medication dependence; and (4) major depression. (*Id.* at 478.) Dr. Quintana further opined Plaintiff "can no longer engaged [sic] in competitive employment in his previous line of work." (*Id.* at 478.) Dr. Quintana's follow-up records from December 12, 2004 report Plaintiff's stable condition and authorize medication refills. (*Id.* at 477.)

### c.    *Functional Capacity Evaluation*

Dr. Brinton referred Plaintiff to Joel Meuter, P.T. for a functional capacity evaluation. (*Id.* at 268.) On July 23, 2002, Mr. Meuter conducted the evaluation, finding: (1) Plaintiff was "able to work at the SEDENTARY-LIGHT [sic] Physical Demand Level for an [eight] hour day according to the Dictionary of Occupational Titles;" (2) "a [fourteen percent] whole body impairment for the lumbar spine;" and (3) Plaintiff "exhibited minimal symptom exaggeration behavior by our criteria. . . ." (*Id.*) Mr. Meuter further noted "the minimal symptom

-15-

exaggeration classification did not affect" the results of his assessments, and may have been

attributable to "normal personality traits, anxiety regarding reinjury, [or] a misunderstanding of

the self report pain scales."  (*Id.*)

In a functional capacity assessment report dated October 17, 2004, Dr. Bissell made a

number of findings.  (*Id.* at 471–76.)  First, Dr. Bissell found "L5S, degenerative disc disease with

herniation" limited Plaintiff to lifting and carrying: (1) ten pounds "frequently;" (2) eleven to

twenty pounds "occasionally;" (3) objects heavier than twenty-one pounds "never."[13]  (*Id.* at 471.)

At one time without interruption, Plaintiff could: (1) sit for one hour and then stand for fifteen

minutes before resuming sitting; (2) stand for one hour and then sit for fifteen minutes before

resuming standing; and (3) walk for one hour.  (*Id.* at 472.)  In an eight-hour day, Plaintiff could

sit for two hours, stand for three hours, and walk for three hours.  (*Id.*)  Dr. Bissell opined that

Plaintiff was disabled from working eight hours per day, forty days per week on a sustained basis.

(*Id.* at 475.)

## 2.    *Procedural History*

On October 8, 2002, Plaintiff filed an application for disability insurance benefits.  (*Id.* at

58–60.)  On December 3, 2002, the Social Security Administration denied Plaintiff's application.

(*Id.* at 51–57.)  On January 10, 2003, Plaintiff requested a hearing before an administrative law

judge ("ALJ").  (*Id.* at 50.)  On September 22, 2004, the ALJ held a hearing, at which Plaintiff

---

[13]The assessment included the following relevant definitions: (1) "occasionally" means up
to one-third of an eight-hour workday; and (2) "frequently" means one-third to two-thirds of the
workday.  (Admin. R. at 471.)

testified, represented by his attorney.  (*Id.* at 20.)  Plaintiff's wife and a vocational expert ("VE")
also testified at the hearing.  (*Id.*)

Plaintiff testified that he could not work in a job that required him to stand for six to eight
hours each day because standing for over an hour caused severe pain that would prevent him from
"thinking straight."  (*Id.* at 575.)  Plaintiff stated that he could work for eight hours in a job that
involved spending time "mostly sitting so [he] could get up and move around if [he] needed
to . . . ."  (*Id.*)  However, Plaintiff asserted that if he could not get up to move around, then a
bone spur in his perineal area would preclude him from working.  (*Id.* at 575–76.)

Plaintiff testified that the first two fingers on his right hand "don't bend" and are numb.
(*Id.* at 578.)  When asked about his use of OxyContin, Plaintiff stated that the drug helped with
his pain, but it also made it difficult for him to concentrate.  (*Id.*)

Plaintiff testified that as he was sitting before the ALJ, his back hurt and he suffered "[r]eal
[sic] bad nerve pain and burning pain in [his posterior]."  (*Id.* at 589.)  Plaintiff also noted that he
avoids taking Butame for his edema because it dehydrates him and causes fatigue.  (*Id.* at
589–90.)  Plaintiff testified that he took the drug when he attended vocational classes at Trinidad
Junior College from summer 2003 to spring 2004.  (*Id.* at 590.)  Plaintiff stated the classes were
difficult because he is "a slow learner" and his edema bothered him.  (*Id.* at 591–92.)

When questioned regarding his daily activities, Plaintiff said his routine varies depending
on his wife's work schedule.  (*Id.* at 593.)  Plaintiff stated he tries to "have the dishes done
and . . . have dinner ready and stuff like that."  (*Id.*)  Plaintiff testified that "some days [he will] lay
down all day and some days [he is] more active," but that he has "killer pain" every day.  (*Id.*)  At

-17-

first, Plaintiff was unable to articulate how often his pain kept him from getting around at all, stating that "[i]t just varies" and nothing in particular precipitates it, but that bad pain days "just happen[]." (*Id.* at 594.) Later Plaintiff asserted that he suffers from pain that forces him to spend two or three days each week in repose. (*Id.*)

Plaintiff's wife, Linda Novak, also testified. (*Id.*) She testified that Plaintiff had previously lead an active life, but that he now stays in bed for "days at a time." (*Id.* at 596.) Ms. Novak also testified that Plaintiff's pain caused his depression and that she finds Plaintiff in bed crying on occasion. (*Id.* at 596–97.) She asserted that Plaintiff's pain sometimes prevents him from doing household chores, such as laundry and dishes. (*Id.* at 596.) She testified that Plaintiff obtained excellent grades in his classes at the junior college, noting that he was bothered by edema during that period. (*Id.*)

The VE testified at the hearing regarding her review of the vocational exhibits in Plaintiff's file. (*Id.* at 584–85.) The VE testified that Plaintiff's former job as a: (1) resident counselor was light, but would require Plaintiff to be on his feet frequently; (2) press operator was medium with an specific vocational preparation ("SVP") of three; (3) machine operator was medium with an SVP of three; (4) tree cutter was heavy and semi-skilled; and (5) fast food worker was light with an SVP of two.[14]  (*Id.*)

---

[14]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

The ALJ posed a hypothetical to the VE, asking whether a person with Plaintiff's education, work history, and the following residual functional capacity ("RFC") could perform work previously performed by Plaintiff:

> Avoid concentrated exposure to temperature extremes, vibrations and hazardous conditions.  And a moderate limitation on concentration, persistence and pace due to the need to take narcotics for pain. . . . No significant postural activities[, but] he can[] get up and down.  But he can't wiggle, twist, turn or bend . . . .  [N]o fine manipulation in the right, dominant hand.

(*Id.* at 585–86.)  The VE determined that such a person could not perform Plaintiff's past work, but she stated such a person could work as a "charge account clerk" or a "call out operator," jobs with an SVP of two and occasional hand use.  (*Id.* at 586–87.)  At the end of the hearing, the ALJ gave Plaintiff two weeks to submit an assessment from Dr. Bissell that explained Plaintiff's sitting limitations, which the ALJ noted were not confirmed by medical evidence.  (*Id.* at 598, 471–76.)

On November 5, 2004, the ALJ issued a decision.  (*Id.* at 20–28.)  In it, the ALJ noted that Plaintiff had failed to submit an assessment from Dr. Bissell.  (*Id.* at 20.)  The ALJ determined Plaintiff was not disabled, because he retained the residual functional capacity to perform work that exists in the national economy.  (*Id.* at 21.)  In reaching his conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since the onset of his alleged disability.  (*Id.*)  Next, the ALJ determined Plaintiff had a "severe" impairment based on his "degenerative disc disease and degenerative joint disease of the lumbar spine; right sacroiliitis; right ischial bursitis; a chronic groin strain; and mild peripheral neuropathy of the lower extremities."  (*Id.* at 22.)  Third, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements in any of the established listings.

(*Id.*)  Then the ALJ determined Plaintiff's RFC, indicating that the alleged severity of Plaintiff's

pain and limitations was unpersuasive.  (*Id.* at 24–25.)  In making this determination, the ALJ

noted, *inter alia*, that: (1) Plaintiff had stated at the pain clinic that while he had difficulty with

normal daily activities, he was able to do them all; (2) an August 2002 assessment suggested

Plaintiff exaggerated his pain; and (3) a variety of medical findings from 2002 and 2003 suggested

Plaintiff was capable of a broad range of physical activities.  (*Id.* at 24.)  The ALJ gave "greatest

weight to" the extensive opinions of Dr. Brinton.  (*Id.* at 25.)  The ALJ gave "little weight" to the

opinions of Drs. Sharbaugh and Sternberg because "neither physician provided a comprehensive

assessment for the claimant."  (*Id.*)  The ALJ gave little weight to Dr. Quintana's opinions, since

"his statement regarding the claimant's training is outside his area of expertise, and he provided

no specific functional limitations."  (*Id.*)  Thus, the ALJ concluded that Plaintiff retains the RFC:

> for sedentary work; without significant postural activities with no requirement for fine
> manipulation with the right (dominant) hand; with avoidance to concentrated exposure to
> temperature extremes, vibrations and hazardous conditions; and with moderate limitations
> in concentration, persistence and pace, due to his use of narcotic medications. Sedentary
> work involves lifting no more than [ten] pounds at a time, standing and walking
> occasionally, and sitting the remainder of the time.

(*Id.* at 25.)  The ALJ found that Plaintiff's RFC precluded him from performing his past relevant

work, but then proceeded to determine that jobs available to those with Plaintiff's RFC exist in

significant numbers in the national economy.  (*Id.* at 26.)  Accordingly, the ALJ determined

Plaintiff was not disabled.  (*Id.*)

On September 8, 2005, the Appeals Council denied Plaintiff's request for review of the

ALJ's decision, making it the final administrative decision for the purposes of judicial review.  (*Id.*

at 6–8.)  The Appeals Counsel specifically noted that additional evidence submitted by Plaintiff,

which included Dr. Bissell's functional capacity assessment, did "not provide a basis for changing

the [ALJ's] decision."  (*Id.* at 6–7.)  On November 11, 2005, Plaintiff filed a complaint in this

court challenging the Commissioner's denial of disability benefits.  (Compl. [filed Nov. 11,

2005].)  On April 16, 2006, Plaintiff filed his opening brief.  (Pl.'s Opening Br. [filed Apr. 16,

2006] [hereinafter "Pl.'s Br."].)

## ANALYSIS

### 1.     *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported
> by substantial evidence, shall be conclusive, and where a claim has been denied by
> the Commissioner of Social Security or a decision is rendered under subsection (b)
> of this section which is adverse to an individual who was a party to the hearing
> before the Commissioner of Social Security, because of failure of the claimant or
> such individual to submit proof in conformity with any regulation prescribed under
> subsection (a) of this section, the court shall review only the question of
> conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g) (2006).  Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The

court must uphold the Commissioner's decision if it is supported by substantial evidence.  *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot re-weigh the evidence

or substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir.

1987). That does not mean, however, that my review is merely cursory. To find that the ALJ's

decision is supported by substantial evidence, the record must include sufficient relevant evidence

that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*,

816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is

overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting

it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to

reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th

Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.    *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meets the insured status requirements, is less than sixty-five years of age, and is

under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make

a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v.

Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the

Commissioner must show that the claimant can do other work activities and that the national

-22-

economy provides a significant number of jobs which the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2007). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d) (2006). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e) (2007); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751.

### 3.       *Disability Determination*

Plaintiff sets forth four arguments in support of his contention that the ALJ's decision is erroneous.  Plaintiff argues the ALJ erred because: (1) the ALJ's step-three evaluation ignored evidence that Plaintiff met Listing 1.04 and failed to articulate reasons why Plaintiff's impairments did not equal Listing 1.04; (2) the ALJ failed to link his pain and credibility findings to relevant evidence; (3) evidence the ALJ requested but Plaintiff failed to submit until he appealed the ALJ's decision "provide[s] a basis for changing the ALJ's decision;" and (4) the ALJ failed to meet his step-five burden by not including all of Plaintiff's impairments in the hypothetical he posed to the VE.  I consider each argument in turn.

### a.       *Step Three*

Plaintiff argues that the ALJ failed to discuss the evidence and explain why Plaintiff was not disabled at step three, as required by *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  First, Plaintiff haphazardly asserts that "[w]hile there are some findings to the contrary, there is arguably a preponderance of the evidence to show that [Plaintiff] . . . met Listing 1.04."  (Pl.'s Br. at 21.)  Even if he did not meet Listing 1.04, Plaintiff next argues, his "right sacrolitis [sic], right ischial bursitis and a right thigh adductor strain" support a finding that his condition equaled Listing 1.04.  (*Id.* at 21–22.)

In relevant part, Listing 1.04 provides:

Disorders of the spine (e.g., . . . degenerative disc disease . . .), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test . . .; or . . .

C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2007).  The ALJ found:

[Plaintiff] does not have impairments that meet the criteria of any of the listed impairments because the necessary clinical signs and diagnostic findings have not been established.  The undersigned has specifically considered Sections 1.00 ff., and 11.00 ff., concerning musculoskeletal and neurological impairments, respectively.

(Admin. R. at 22–23.)

Although Plaintiff suggests otherwise, the fact that the ALJ did not proceed step-by-step through Listing 1.04 — or any of the other listings he claimed to have "specifically considered" — does not necessarily establish error.  *See Rice v. Barnhart*, 384 F.3d 363, 370 & n.5 (7th Cir. 2004) (declining to review ALJ's conclusory determination at step three in isolation from rest of decision).  Indeed, "where an ALJ provides detailed findings [at other steps of the sequential process] . . . that confirm rejection of the listings in a manner readily reviewable, requiring reversal would extend *Clifton* beyond its own rationale."  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005).  As set forth below, I find that the ALJ provided sufficiently detailed findings supported by substantial evidence that confirm rejection of Listing 1.04.

The ALJ unquestionably recognized that Plaintiff had a spinal disorder akin to those contemplated by Listing 1.04.  (*Compare* Admin. R. at 21 [recognizing Plaintiff has "degenerative disc disease"], *with* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2007) [recognizing that "degenerative disc disease" is a "[d]isorder of the spine"].)  Further, the ALJ pointed to evidence indicating that Plaintiff's disorder *did not* "result[] in compromise of a nerve root . . . or spinal chord" as required by the listing.  (*See* Admin. R. at 21, 22 [finding no "significant canal compromise;" finding "relatively subtle findings, with narrowed vertebrae at L5–S1;" finding "no[] confirmation of nerve root compromise via imaging"].)  I recognize that this finding is in tension with a May 31, 2002 spinal x-ray, which found a protrusion that "would probably compromise the spinal canal."  (*Id.* at 262.)  However, the doctor interpreting the x-ray noted: "Quarry [sic] whether there is nerve root compromise, also and [sic] MRI might be helpful to determine if clinically indicated."  (*Id.*)  When Dr. Wong reviewed a lumbar MRI on September 5, 2002, he stated the MRI revealed "no major canal or nerve root compromises."  (*Id.* at 291.)  This finding is in accordance with: (1) Dr. Brinton's review of a January 31, 2002 MRI, which revealed disc bulges in Plaintiff's lower back "without significant impingement;" and (2) Dr. Brantley's review of a December 3, 2003 MRI, which revealed lower back protrusions of "questionable clinical significance."  (*Id.* at 348, 417.)  Thus, although the sprawling record of countless doctor's visits in this case does give rise to some inconsistent evidence concerning whether Plaintiff's spinal canal or nerve roots were compromised, I find that substantial evidence supported the ALJ's finding that they were not.  While I might well have come to a different conclusion had I been called upon to weigh the evidence, my finding that the ALJ's conclusion was supported by

substantial evidence terminates my review, for I may neither re-weigh the evidence nor substitute

my judgment for that of the ALJ.  *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff further asserts that the ALJ overlooked other evidence relevant to a finding of

disability under subsections *A* and *C* of Listing 1.04.  Assuming, *arguendo*, that Plaintiff is

correct, the ALJ's failure to consider such evidence would not be in error.  "For a claimant to

show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An

impairment that manifests only some of those criteria, no matter how severely, does not qualify."

*Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (citation omitted) (emphasis added).  Since I have

found substantial evidence supported the ALJ's finding that Plaintiff failed to demonstrate a spinal

disorder "resulting in compromise of a nerve root . . . or the spinal cord," I need not consider

whether Plaintiff's impairment satisfied Listing 1.04's further criteria.  *Id.*

Finally, Plaintiff contends that: (1) his "right sacrolitis [sic], right ischial bursitis and a right

thigh adductor strain" support a finding that his condition equaled Listing 1.04; and (2) the ALJ's

failure to explain why Plaintiff's impairments did not equal Listing 1.04 constitutes error.  (*See*

Pl.'s Br. at 21–23.)  Plaintiff neglects, however, to: (1) explain how such ailments support a

finding that his condition equals Listing 1.04; or (2) cite any authority suggesting that an ALJ has

any duty to state explicitly why a claimant does not equal a particular listing.  The Supreme Court

has stated:

> For a claimant to qualify for benefits by showing that his unlisted impairment, or
> combination of impairments, is "equivalent" to a listed impairment, he must present
> medical findings equal in severity to *all* the criteria for the one most similar listed
> impairment.  A claimant cannot qualify for benefits under the "equivalence" step by

> showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment.

*Zebley*, 493 U.S. at 531 (citations and footnotes omitted) (emphasis in original); *see also Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (quoting 20 C.F.R. § 404.1526) ("To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment."). A comparison of the three conditions Plaintiff asserts cause him to equal Listing 1.04 with Listing 1.04's first criterion demonstrates that Plaintiff's impairments do not equal the listing. As indicated above, Listing 1.04 contemplates "[d]isorders of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2007). As noted above, right sacroiliitis is joint inflammation in the hip. 5–S ADM 185, 207, *supra* note 1. Bursitis of ischial tuberosity is inflammation of the lower part of the hip bone, usually caused by prolonged sitting. 1–B ADM 5122; 3–I ADM 4420. A right thigh adductor strain is a groin strain. 6–T ADM 483. Once stripped of obfuscating medical jargon, it becomes apparent that Plaintiff's hip and groin problems do not equate to a spinal disorder contemplated by Listing 1.04. The ALJ's failure to point this out is not error.

### b.    *Pain and Credibility Evaluation*

Plaintiff asserts the ALJ failed to link his pain and credibility findings to relevant evidence. (Pl.'s Br. at 23.) Plaintiff further argues the ALJ failed to make clear to subsequent reviewers how he weighed Plaintiff's testimony or why he weighed it as he did. (*Id.* at 24.)

"'Credibility is the province of the ALJ.'"  *Musgrave v. Sullivan*, 966 F.2d 1371, 1376

(10th Cir. 1992) (quoting *Brown v. Bowen*, 801 F.2d 361, 362–63 [10th Cir. 1986]).  Indeed,

credibility determinations made by an ALJ are generally considered binding upon review.  *Gossett*

*v. Bowen*, 962 F.2d 802, 807 (10th Cir. 1988).  Such determinations "should not be upset if

supported by substantial evidence."  *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).  An

ALJ "can weigh and evaluate numerous factors in determining the credibility of pain testimony."

*Huston*, 838 F.2d at 1132.  Some of the possible factors include: (1) the consistency or

compatibility of nonmedical testimony with objective medical evidence; (2) the nature of daily

activities; (3) subjective measures of credibility; (4) the levels of medication and their

effectiveness; (5) the extensiveness of attempts to obtain relief; and (6) the frequency of medical

contacts.  *Id.*  For the reasons set forth below, I find that the ALJ made no legal error in basing

his determination on the factors he considered.

Plaintiff points to the ALJ's statement that Plaintiff's testimony was "forthright and

sincere" and argues the ALJ should have thus accepted his testimony "as true."  (Pl.'s Br. at 23.)

The ALJ's statement, however, is not inconsistent with his ultimate determination that Plaintiff

"was not fully persuasive regarding his symptomatology and resulting limitations."  (Admin. R. at

27.)  Indeed, the ALJ noted that although Plaintiff asserted he "lacked the stamina to sustain a

regular workweek" or "to sit for long periods of time," functional capacity assessments by Dr.

Brinton and physical therapist Joel Meuter found Plaintiff to be capable of sedentary work.  (*Id.* at

25.)  Moreover, Plaintiff himself testified that he could work a sedentary job if it allowed him to

stand up and move around every now and then.  (*Id.* at 575.)  Thus, the ALJ rightly relied on

inconsistencies between objective medical evidence and nonmedical testimony in making his

credibility determination.  *Huston*, 838 F.2d at 1132.

The ALJ also relied on discrepancies between the nature of Plaintiff's daily activities and

his claims of total disability.  *See id.*  For example, the ALJ noted Plaintiff reported in an October

2002 daily activity questionnaire that he: (1) fed his pets and chickens; (2) made his bed; (3) did

laundry occasionally; (4) researched his ailments on the internet for a couple of hours; (5) went

for walks on his property; and (6) performed minor vehicle repairs.  (Admin. R. at 24.)  The ALJ

also noted that Plaintiff had reported in his pain management program "that he had difficulty with

normal daily activities, but was able to do them all, and continued to perform maintenance on his

truck."  (*Id.*)  Plaintiff's own assertion that he was able to do all of his normal daily activities

sheds a strong shadow of doubt on his claim that his pain is so bad that he is bedridden two to

three days each week.  (*See id.* at 594.)  Further, although Plaintiff asserted that he had to quit

attending classes at the junior college because of his edema, he attained "excellent" grades in

those classes he completed.  (*Id.* at 590, 596.)  Although Plaintiff testified that his edema

medication "dehydrates [him] a lot," it appears that Plaintiff never indicated as much to his

treating physician.  (*Id.* at 589, 490.)  Consequently, I find that the ALJ's credibility and pain

determination is supported by substantial evidence.

Plaintiff also asserts the ALJ erred by relying on Waddell's signs in making his pain and

credibility determination.  (*Id.* at 24.)  The Ninth Circuit has explained:

> Physicians use Waddell tests to detect nonorganic sources, such as psychological
> conditions or malingering, for lower back pain. There are five types of Waddell's

signs. "[A] finding of three or more of the five types is clinically significant. Isolated positive tests are ignored."

*Reinertson v. Barnhart*, 127 F. App'x 285, 289 (9th Cir. 2005).  In noting that Plaintiff "had displayed positive Waddell's signs in the past," the ALJ cited to, *inter alia*, Dr. Brinton's summary of a physical therapist's functional capacity report that noted a Waddell's score of two out of five, which constituted "minimum symptom exaggeration." (Admin. R. at 24.)  While *Reinertson* indicates that reliance on such a "clinically insignificant" finding is inappropriate, any such error is ameliorated by other evidence that supports exaggeration, such as the ALJ's citation to: (1) an April 2002 assessment noting Plaintiff "seemed to exhibit a lower than average pain threshold;" and (2) a July 2002 exam that found Plaintiff performed straight leg testing without pain when distracted.  (*Id.* at 24.)  Further, as the ALJ noted, Dr. Brinton found that Plaintiff "moves easily and briskly and that heel-walk, toe-walk and bilateral step-up exercises demonstrate[s] normal functioning strength." (*Id.*)  Additionally, Dr. Brinton noted that "secondary gain" might motivate Plaintiff's assertions concerning his pain.[15]  (*Id.* at 355.)  Thus, substantial evidence supports the ALJ's finding that Plaintiff's testimony concerning the extent of his disabling pain is not fully credible.

Finally, Plaintiff asserts that the following evidence ought to have been considered in the ALJ's credibility and pain determination: (1) a diagnosis of pain disorder by a psychologist; (2) Plaintiff's "motivation to work or to try rehabilitation;"(3) the "nature of [Plaintiff's] disabling

---

[15]Secondary gain is a psychiatric term for the advantages, such as sympathy, attention, or assistance, that individuals derive from being afflicted by an actual illness.  5–S ADM 1730, *supra* note 1.

pain upon his limited daily activities;" (4) Plaintiff's depression and nausea; (5) Plaintiff's "opioid and benzodiazepe [sic] dependency;" and (6) "medication types, dosages, effectiveness and side-effects of her [sic] medications" or "other modalities of pain relief."  (Pl.'s Br. at 24–26.)  I must pause to express my profound dismay over Plaintiff's preferred method of "argument."  Instead of articulating why and how both the law and the evidence relate to and support his position, Plaintiff merely asserts that the ALJ failed to consider certain evidence and then furnishes ramshackle string citations to legal authority and portions of the record of varying degrees of relevance, leaving it to the court and his opponent to discern how his citations relate to his otherwise bald assertions of error.  *Cf.* Colo. R. Prof. Conduct 1.1, cmt. (2006) ("Competent handling of a particular matter includes inquiry into and *analysis of the factual and legal elements of the problem. . . .*") (emphasis added). Reading Plaintiff's brief is akin to sitting down at a restaurant, only to have the chef emerge, force you into the kitchen, point to a pile of raw ingredients, declare "*Bon appétit!*" and then depart.  To say the least, I am underwhelmed by this neglectful approach to advocacy.

Moreover, I fail to see — and Plaintiff fails to explain — how much of this evidence is even tangentially related to the issue of Plaintiff's credibility.  To the extent that Plaintiff's vague, conclusory, and underdeveloped arguments constitute an invitation for this court to re-weigh the evidence and substitute my judgment for that of the ALJ, I decline to do so.  *See Jordan*, 835 F.2d at 1316.  Moreover, "[t]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."  *Clifton*, 79 F.3d at 1009–10.  The record clearly demonstrates the ALJ considered all of the evidence.  The ALJ's

opinion consists of a thorough yet concise summary of the most material aspects of the sprawling record of medical evidence. (Admin. R. at 20–28.) The mere fact that the ALJ failed to *discuss* every piece of evidence presented in over four-hundred pages of medical records does not support Plaintiff's conclusory assertions that the ALJ failed to *consider* the above-referenced aspects of the record. (*See id.* at 131–569.) If such were an ALJ's burden, the Social Security Administration's work would grind to a screeching halt.

Even assuming it is relevant to the credibility determination, the laundry list of ailments Plaintiff claims the ALJ ignored hardly suggests the ALJ's determination was not founded upon substantial evidence. First, the pain disorder diagnosis tends to undercut, rather than buttress Plaintiff's credibility. *See* 5–PR ADM 2320, *supra* note 1 (defining pain disorder as a "mental disorder characterized by chronic complaints of pains which have no organic basis or justification and which are assumed to be caused by mental or emotional factors."). Second, although Plaintiff cites to *Tyson v. Apfel*, 107 F. Supp. 2d 1267, 1270 (D. Colo. 2000) for the proposition that "[w]here a claimant has a good work history, she is entitled to substantial credibility when she then asserts that she is unable to work," the record fails to present convincing evidence supporting Plaintiff's conclusory assertion that he has "a good work history." (Pl.'s Br. at 25.) His wife's testimony that he is a "good worker" and a summary of his FICA earnings for the years 1972–2001 hardly convinces me that the ALJ erred in discounting Plaintiff's asserted inability to work. (Admin. R. at 63, 596.) Third, Plaintiff's assertion that the ALJ failed to assess the nature or impact of his pain is disingenuous. (Pl.'s Br. at 25.) The ALJ specifically considered Plaintiff's own statements to the pain clinic, in which he admitted that although he had difficulty with normal

-33-

daily activities, he was able to do them all.  (Admin. R. at 24.)  And I am perplexed as to how Plaintiff's collection of the various adjectives he has used to describe his pain supports a finding that the ALJ failed to consider the "location, duration, frequency, and intensity of" Plaintiff's pain. (Pl.'s Br. at 25.)  Whether Plaintiff asserted his pain to be "chronic," "acute or sharp," "persistent," "penetrating," "stabbing," "burning or stinging," or "killer" simply does not speak to the credibility of his assertions of pain.  (*See id.*)  Fourth, notwithstanding Plaintiff's bald contention to the contrary, I find the ALJ considered his depression — and appropriately determined, based upon substantial evidence, that it was not disabling.  (Admin. R. at 22.)  While Dr. Quintana did opine that Plaintiff is disabled by, *inter alia*, major depression, such a diagnosis was properly discounted in light of: (1) the absence of findings upon which it was based; (2) evidence that Plaintiff took effective medications and was coping well with his symptoms; and (3) nearly contemporary findings that Plaintiff tested negative for depression.  (*Id.* at 319, 427, 448, 478, 551.)  With respect to Plaintiff's contention that the ALJ failed to consider his nausea, I note Plaintiff himself never asserted that his nausea was disabling and, moreover, Plaintiff's own written representations to the Social Security Administration reflect that a daily dose of metoclopramide effectively treats the ailment.  (*Id.* at 92.)  Fifth, while the record does indeed reflect that Plaintiff has an longstanding opioid and benzodiazepine dependence, the record is devoid of any diagnoses indicating that such a dependence would preclude him from engaging in substantial gainful activity.  Moreover, the ALJ expressly incorporated the negative effects of Plaintiff's reliance on narcotics into Plaintiff's RFC.  (*Id.* at 27.)  Finally, although the ALJ could have given specific consideration to the medications and "other modalities of pain relief" Plaintiff

employed, that the ALJ did not expressly consider them in his written opinion is not error. *See Clifton*, 79 F.3d at 1009. Indeed, Plaintiff's own representations suggest that most of the extensive cocktail of drugs he takes are helpful. (*See* Admin. R. at 92 [hydrocodone is the "best so far" for his pain; Neurontin "helps with trembles;" amitriptyline and flurazepam are both "very" effective].) Consequently, none of the evidence Plaintiff points to suggests the ALJ's credibility and pain determination was not supported by substantial evidence.

### c.      *Dr. Bissell's Functional Capacity Assessment*

At the end of a paragraph in the section of his brief concerning credibility, Plaintiff argues, seemingly at random, that "[i]t isn't clear why Dr. Bissell's opinion of RFC did not provide a basis for changing the ALJ's decision." (Pl.'s Br. at 24.) This argument requires some unpacking. As indicated above, Plaintiff neglects to mention that the ALJ requested an assessment from Dr. Bissell in order to further understand Plaintiff's sitting limitations. (Admin. R. at 20.) This assessment was to be submitted within two weeks of Plaintiff's September 2004 hearing, but Plaintiff failed to submit any such evidence — even though Dr. Bissell completed a functional capacity assessment in October 2004 — until he brought his case before the Social Security Appeals Council in June 2005. (*See id.* at 20, 464–70.)

Setting aside the inference of dereliction on the part of Plaintiff's counsel raised by this set of facts, I find that Dr. Bissell's October 2004 assessment "relates to the period on or before the date of the administrative law judge hearing decision," which was issued in November 2004, and thus may be considered in deciding whether substantial evidence supports the ALJ's opinion. *See* 20 C.F.R. § 404.970(b) (2007); *see also O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)

("[N]ew evidence becomes part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence."); *Stephens v. Callahan*, 971 F. Supp. 1388, 1390 (D. Okla. 1997) (commenting on the "peculiar task" required under *O'Dell* of speculating as to how an ALJ would have weighed medical records produced to the Appeals Council).  As set forth below, however, I find the ALJ's actions, findings, and conclusions are not contrary to the weight of the evidence, even giving careful consideration to Dr. Bissell's newly presented assessment. *See* 20 C.F.R. § 404.970(a)(3) (2007).

In his hearing, Plaintiff asserted Dr. Bissell had diagnosed a bone spur or "ischial bursa spur" that precluded him from sitting comfortably.  (Admin. R. at 575–76.)  Thus, the ALJ sought evidence from Dr. Bissell as to whether the spur would preclude Plaintiff from performing sedentary work.  (*Id.* at 599.)  The ALJ did so, notwithstanding this exchange:

> Q. Well, if you had a job that instead of being on your feet all the day involved mostly sitting so you could get up and move around if you needed to, how— could you be on your feet for how long during the day?
> A. You mean up and down?
> Q. Yeah.
> A. I could probably go for eight hours up and down if I could sit down.
> Q. Yeah.  So now if you had a sit down job, mostly sit down, would you have trouble doing that kind of activity?
> A. Yes, sir.  The reason why is because [of my bone spur].

(*Id.* at 575.)  In a questionnaire — apparently supplied to Dr. Bissell by Plaintiff's lawyer — Dr. Bissell indicated that Plaintiff's "ischial bursa spur" would *not* cause Plaintiff to need to avoid prolonged sitting.  (*Id.* at 475.)  Instead, Plaintiff would need to avoid sitting "more likely [because of] L5-S, disk protrusion."  (*Id.*)  This finding, however, is inconsistent with a substantial body of evidence.  Indeed, the disk ailment that lead Dr. Bissell to conclude Plaintiff

could not engage in sedentary work is the very same ailment that lead Dr. Brinton to conclude

Plaintiff is limited to "sedentary work only with very limited standing and walking." (*Compare id.*

at 472, 475, *with id.* at 312.)

When faced with conflicting medical evidence, such evidence is evaluated in terms of

consistency with the record as a whole. *See* 20 C.F.R. § 404.1527(d)(4) (2007) ("Generally, the

more consistent an opinion is with the record as a whole, the more weight we will give to that

opinion."). Dr. Brinton's assessment comports with a physical therapist's July 2002 assessment

that Plaintiff is capable of light sedentary work. (Admin. R. at 268.) More significantly, Dr.

Brinton's assessment comports with Plaintiff's own testimony that he could handle a job that

involved "mostly sitting so [he] could get up and move around if [he] needed to [do so]." (*Id.* at

575; *see also id.* at 502 [noting Plaintiff's report that he tolerated sitting well].) Nothing beyond

Dr. Bissell's assessment serves to dispel the ALJ's concern regarding a paucity of medical

evidence evincing Plaintiff's inability to do sedentary work. (*See id.* at 599–600.)

Moreover, while Dr. Brinton's assessment of Plaintiff's functional capacity is supported by

a thoroughly documented review of Plaintiff's medical records, along with an extensive treatment

relationship between Plaintiff and Dr. Brinton spanning from December 2001 through May 2003

(*see id.* at 308–74, 496–502), Plaintiff saw Dr. Bissell only occasionally for pain treatments. (*See

id.* at 451–61, 503–04, 527–29, 531–38.) With respect to Dr. Bissell's functional capacity

assessment itself, I find it to be devoid of accompanying documentation indicating it is supported

by objective medical findings. (*See id.* at 471–76.) Weighing the record as a whole, particularly

Dr. Brinton's assessment that Plaintiff is capable of sedentary work together with Plaintiff's

representations to that effect, I find substantial evidence supports the ALJ's determination that

Plaintiff is capable of sedentary work notwithstanding Dr. Bissell's inconsistent opinion.  *See* 20

C.F.R. § 404.1527(b) (2007) (stating medical opinions must be considered with all the relevant

evidence); *White*, 287 F.3d at 907 (explaining that a treating physician's opinion should be

consistent with other substantial evidence).

  **d.**  ***The ALJ's Hypothetical***

  Plaintiff asserts that the hypothetical the ALJ posed to the VE failed to include Plaintiff's

pain, hand tremors, need to change positions frequently, depressive symptoms, fatigue, and

occasional insomnia.  (Pl's Br. at 27.)  I must pause to note that although Plaintiff was

represented by counsel at the hearing, Plaintiff's counsel himself failed to pose a hypothetical

including such additional symptoms.  (Admin. R. at 585.)  Setting this observation aside, I reject

Plaintiff's argument as a wholly disingenuous, thinly veiled invitation for me to re-weigh the

evidence, which I decline.  *See White*, 287 F.3d at 910.  For the reasons set forth below, I find

that the ALJ did not err by omitting the above-listed complaints from his hypothetical to the VE.

  Although the ALJ did not expressly state as much, it is obvious that the pain caused by

Plaintiff's various disorders was the reason the ALJ's hypothetical included such limitations as no

"significant postural activities . . ., wiggl[ing], twist[ing], turn[ing] or bend[ing]."  (Admin. R. at

585–86.)  Plaintiff's attempt to divorce consideration of his pain from consideration of the

conditions causing it is unavailing.

  With respect to his hand tremors and edema, Plaintiff himself noted that his medications

help resolve the problems.  (*Id.* at 92, 490.)  Moreover, Plaintiff never asserted that his tremors

impeded his ability to attend classes at the junior college or to research his ailments on the internet — activities that most certainly would be impacted by such an impairment if it were anything but mild. (*See id.* at 131–569.) Furthermore, while Plaintiff did report to a treating source that his edema medication "does help," the record *does not* indicate Plaintiff complained of any side effects prior to his hearing before the ALJ. (*Id.* at 490.) This brings the analysis back to the ALJ's credibility determination, which I have already affirmed. *See* Analysis § 3b, *supra*.

With respect to Plaintiff's depression, Plaintiff does not attack either the ALJ's step-two finding that Plaintiff's depression was "no more than mild" and did not constitute a "severe" impairment. (Admin. R. at 22.) If a mental impairment is found not to be "severe," then it is not relevant to the RFC determination. 20 C.F.R. § 404.1520a(d)(3) (2007). A VE is called upon to testify as to whether a claimant's RFC allows him to return to his past relevant work or adjust to any other work. *Id.* § 404.1560(b)(2), (c)(1). Thus, since Plaintiff's "mild" depression was not relevant to his RFC, it need not have been touched upon in the ALJ's hypothetical to the VE.

Plaintiff's complaint that the hypothetical failed to incorporate his insomnia is also without merit. The record reflects that Plaintiff's complaints of insomnia were merely sporadic. (Admin. R. *passim*.) Indeed, the most recent aspect of the record to which Plaintiff cites in support of the existence of disabling insomnia notes that he "is sleeping well" and getting "at least eight hours" of sleep each night. (*Id.* at 497.) Moreover, Plaintiff himself neglected to mention insomnia as an illness or condition that limits his ability to work in his application for social security disability benefits. (*Id.* at 75.) In light of all of the foregoing, I find substantial evidence supported the precise hypothetical the ALJ posed to the VE.

**_4._**     **_Conclusion_**

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is

AFFIRMED.

Dated this 2nd day of February, 2007.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge
